UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMANTHA ELIZABETH BIDAD,<br>Plaintiff,<br>v.<br>NANCY A. BERRYHILL,<br>Defendant. | Case No. 17-cv-00679-JSC<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 19 |

Plaintiff Samantha Elizabeth Bidad seeks social security benefits for a combination of mental and physical impairments, including: extreme pain, cystic hygroma, neck and arm pain, stiffness, fatigue, and mental health issues. (Administrative Record ("AR") 104, 175, 511.) Pursuant to 42 U.S.C. § 405(g), Ms. Bidad filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security denying her benefits claim. Now before the Court are Plaintiff and Defendant's Motions for Summary Judgment. (Dkt. Nos. 18 & 19.) Because the Administrative Law Judge ("ALJ") improperly weighed the medical opinion evidence, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for further proceedings.

**LEGAL STANDARD**

A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be

severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL BACKGROUND

In 2010, Ms. Bidad first filed for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, alleging disability beginning in 2006 caused by a cystic hygroma and neck problems. (AR 74, 511.) Ms. Bidad's initial application and request for reconsideration were denied. (AR 273.) Ms. Bidad requested a hearing, and following a hearing before an ALJ, the ALJ denied benefits in 2011. (AR 74, 273.) Ms. Bidad thereafter sought judicial review of the denial under 42 U.S.C. § 405(g) and the district court affirmed. *See Bidad v. Colvin*, No. 12-CV-06384-NJV, 2013 WL 4488695 (N.D. Cal. Aug. 20, 2013).

Concurrent with her request for judicial review, Ms. Bidad filed a new application for SSI under Title XVI on November 29, 2012, amending her disability onset date to that same day. (AR 547.) That application was denied initially on March 1, 2013, and on reconsideration on August, 19, 2013. (AR 74.) Ms. Bidad requested a hearing before the ALJ and in August 2014 Ms. Bidad appeared before ALJ Alberto Gonzalez. (AR 150.) The hearing was continued to schedule a consultative psychologist evaluation. (AR 177.) A supplemental hearing occurred on November 18, 2014. (AR 126.) ALJ Gonzalez again continued the hearing to allow Ms. Bidad's representative to gather mental health records. (AR 148.)

In April 2015, ALJ Serena Hong presided over the hearing that gave rise to the underlying decision here. (AR 470-74.) In a written decision, ALJ Hong found that Ms. Bidad was not

disabled within the meaning of the Social Security Act and its regulations and, therefore, was not entitled to SSI benefits. (AR 71-87.) On December 9, 2016, the Appeals Council considered and denied Ms. Bidad's request for review, making the ALJ's decision final. (AR 1-7.) Ms. Bidad commenced this action for judicial review on February 9, 2017 pursuant to 42 U.S.C. §§ 405(h), 1383(c). (Dkt. No. 1.)

**ADMINISTRATIVE RECORD**

Ms. Bidad was born on October 31, 1964. (AR 97.) She resides in Rohnert Park, California. (AR 97.) She attended school through the 11th grade, but did not complete a GED. (AR 99.) Following surgery in 2005, Ms. Bidad alleges that pain prevented her from returning to work and she has not been able to work since. (AR 100, 108.)

**I. Medical Evidence**

**A. Medical History: Treatment Records**

Ms. Bidad's history of mental health problems dates back to 2006. (AR 796.) Physically, Ms. Bidad has a history of cystic hygroma, neck problems, stiffness, and fatigue. (AR 619, 770.) She alleges that her ailments began after a surgery where a three-pound cyst was removed from her neck and a lipoma was taken from the back of her head. (*Id.*) Ms. Bidad has sought continued treatment for chronic neck pain and her resulting lack of mobility. (*See, e.g.* AR 572, 578, 588.)

**B. Medical Evaluations**

**1. Examining Psychologist Albert Kastl, Ph.D.**

On October 15, 2010, Dr. Kastl examined Ms. Bidad at the request of the Agency. (AR 660.) Ms. Bidad presented with a dysthymic affect and appeared to be in a great deal of pain. (AR 663.) Dr. Kastl's impressions were that Ms. Bidad was "well oriented to time, place and person," "extremely cooperative and friendly and displayed a full range of affect." (*Id.*) He concluded that she had a "mood disorder due to physical condition." (*Id*.)

Dr. Kastl administered several tests to evaluate Ms. Bidad's cognitive ability, memory, and visual-motor skills. He found that Ms. Bidad performed "exactly average caliber" on processing speed, average on visual-motor functioning, and "entirely average caliber" on overall memory. (AR 661-62.) In the remaining areas—conceptual similarities, perceptual reasoning, working

memory, connecting scattered numbers, and alternating between numbers and letters—Ms. Bidad "fell in the low-average range." (AR 661.)

### 2. Examining Physician Soheila Benrazavi, M.D.

On March 9, 2013, Dr. Soheila Benrazavi examined Ms. Bidad at the request of the Agency. (AR 619-24). Dr. Benrazavi conducted a complete internal medicine evaluation, but qualified that it was "not meant to be and must not be construed to be a complete physical examination." (AR 619.) Dr. Benrazavi reported "no acute distress at the time of the examination" and that Ms. Bidad was "cooperative." (AR 620.) Ms. Bidad's flexion was in the normal range for her neck, back, and shoulders. (AR 621.) Dr. Benrazavi noted that Ms. Bidad presented with some tenderness "on palpitation of the midline cervical spine and area of the right trapezius." (AR 623.) Dr. Benrazavi reported that Ms. Bidad was able "to lift and carry 50 pounds occasionally, and 25 pounds frequently, stand and walk for six hours and sit for six hours per eight-hour workday." (*Id.*)

### 3. Treating Physician Joel Lewis, D.O.

On September 24, 2013, treating physician Dr. Joel Lewis completed a "Residual Functional Capacity Questionnaire." (AR 647-52.) He reported monthly treatments over four years, but there are no records of his treatment in the application period. (AR 647.) Dr. Lewis notes Ms. Bidad had "[b]urning pain" and a significant limitation of motion. (*Id.*) He also reported that Ms. Bidad's exhaustion, impaired sleep, malaise, and depression were "reasonably consistent with symptoms and functional limitations." (AR 645, 649.) Dr. Lewis did not find that Ms. Bidad suffered from either psychological factors affecting physical conditions or anxiety. (AR 649.) He noted Ms. Bidad could sit an hour at one time with a two-hour daily maximum; stand for 15 minutes, and stand/walk for less than two hours in a day. (AR 649-50.) Dr. Lewis concluded that Ms. Bidad could only rarely lift less than ten pounds in a competitive work environment. (AR 650.) Similarly, he opined that Ms. Bidad could rarely look down and up, turn her head right or left, or hold her head static. (*Id.*) Dr. Lewis found that Ms. Bidad had significant limitation with reaching, handling and fingering. (AR 651.) He also reported that Ms. Bidad's symptom would frequently interfere with her attention and concentration. (AR 649.)

### 4. Examining Psychologist Jennifer Eggert, Ph.D.

On September 27, 2014, Dr. Jennifer Eggert examined Ms. Bidad at the request of the Agency. (AR 729.) Dr. Eggert reviewed 63 pages of Ms. Bidad's medical records and submitted a psychological evaluation and a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)."

Dr. Eggert observed that Ms. Bidad made adequate eye contact and interacted appropriately. (AR 729.) Ms. Bidad also "appeared sedated secondary to her medication regimen," "mildly dissociative" with "psychomotor retardation," "anxious-depressed" mood, and "constricted and blunted affect." (*Id.*) Dr. Eggert opined that Ms. Bidad had moderate limitations in (1) her ability to understand, remember, and carry out and make judgments on complex instructions and work-related decisions, and (2) in her ability to interact appropriately with the public, supervisors, and co-workers. (AR 726-27.) Dr. Eggert reported that Ms. Bidad's "thought process was linear and mildly impoverished," her working and immediate memory were mildly impaired, and her delayed memory was moderately impaired. (AR 731.)

Dr. Eggert administered two tests where Ms. Bidad "worsened on timed tasks due to her slowed pace." (AR 731-32.) In all but two categories, Ms. Bidad performed below average. (AR 732.) Ms. Bidad's Perceptual Reasoning was average, and her Delayed Memory was Borderline, indicating mild impairment in immediate memory and moderately impaired in short-term delayed memory. (*Id.*)

Dr. Eggert diagnosed Ms. Bidad with Persistent Depressive Disorder (Pure Dysthymic Syndrome), Mild Neurocognitive Disorder Due to Multiple Etiologies, Rule-out Delirium due to Multiple Etiologies, and Medication Induced Movement Disorder. (AR 733.) She noted Ms. Bidad's was "significantly limited in her ability to deal with the stress encountered in competitive work environments . . . [and] to maintain an efficient pace at work." (AR 734.)

### 5. Examining Psychologist Marion Zipperle, Ph.D.

On November 10, 2014, Psychologist Marion Zipperle examined Ms. Bidad at the request of her representative and completed both a "Psychological Evaluation" as well as a "Mental Residual Functional Capacity Questionnaire." (AR 774-83.) Ms. Bidad was accompanied by her

significant other, Carl Bachli, who provided much of the medical history information because Ms. Bidad had "problems with linear memory." (AR 774.) Mr. Bachli reported that Ms. Bidad cannot be left alone, so he takes her everywhere with him including to work. (*Id.*)

Dr. Zipperle administered several tests wherein Ms. Bidad scored well with respect to her ability to learn and recall symbols, numbers and letters in their proper order, but scored high for depression and anxiety. (*Id.*) Ms. Bidad had problems with concentration, appeared confused, disorganized, nonlinear, illogical, anxious, angry, depressed, and endorsed suicidal ideation, negative and paranoid thoughts, auditory hallucinations, and a flat, restricted affect. (AR 777.) Dr. Zipperle further opined that Ms. Bidad distrusted therapists and the mental health system, and was ashamed of her mental health problems, and tried to hide them. (AR 824, 827.)

Dr. Zipperle diagnosed Ms. Bidad with Schizoaffective Disorder, Bipolar Type, ADHD, Cognitive Impairment NOS, Polysubstance Abuse in remission, and Panic Disorder without Agoraphobia. (AR 776.) Dr. Zipperle found Ms. Bidad "capable of simple/repetitive tasks," but markedly limited in her ability to: "do complex/detailed tasks," get "along with supervisors, peers, and public," "remain stable over an 8 hour day," "handle the normal stress of the work world" and "handle time pressure." (*Id.*)

Dr. Zipperle gave Ms. Bidad a poor prognosis and found that she was unable to meet competitive standards of skilled work or particular jobs save "adhere to basic standards of neatness and cleanliness," where Ms. Bidad is "seriously limited, but not precluded." (AR 782.) Dr. Zipperle noted Ms. Bidad will likely be absent from work three or more days per month. (AR 783.)

## II. ALJ Hearing

On April 23, 2015, Ms. Bidad appeared with her representative at her scheduled hearing before ALJ Serena Hong in San Rafael, California. (AR 93.) Ms. Bidad and Vocational Expert ("VE") Robert Cottle both testified at the hearing. (*Id.*)

### A. Ms. Bidad's Testimony

On November 29, 2012, Ms. Bidad applied for social security benefits. (AR 99-100.) Ms. Bidad became disabled on June 1, 2005 following an operation to remove a cyst from her neck.

(AR 99, 104.) After the operation, the Ms. Bidad's right side became stiff and she experienced extreme pain. (AR 104.)

Prior to Ms. Bidad's 2005 surgery, she worked as a fast food cashier, as a cashier and dressing room attendant at Marshalls, and as a telemarketer. (AR 101-03.) After her surgery, Ms. Bidad attempted to work at a restaurant and a grocery store but was unable to maintain the pace of work. (AR 108-09.) For the past two years, Ms. Bidad has worked watering flowers for the county at the Town Recycle and the County Building for two hours a day. (AR 98, 100, 108.) She otherwise spends her time at homeless day centers where she participates in arts and crafts activities. (AR 107-08.)

Ms. Bidad has problems standing and walking as her back goes out on her. (AR 114.) She has a limited ability to lift things and can only lift up to four pounds using both her hands. (AR 114.) Ms. Bidad is not receiving ongoing mental health treatment and she has not used methamphetamine or any illegal drugs since 2006. (AR 110-11, 116.) Ms. Bidad takes Percocet, muscle relaxers, Ibuprofen, and other medications that address her sinuses, constipation, and diarrhea. (AR 112-113.)

### B. Vocational Expert's Testimony

At the ALJ's request, VE Robert Cottle, who reviewed Ms. Bidad's file and was present for Ms. Bidad's testimony, testified regarding Ms. Bidad's ability to perform her past work. The VE classified Ms. Bidad's past relevant work as cashier, fitting room attendant, and telemarketer as (1) "Cashier II" (DOT 211.462-010), requiring light strength, (2) "Sales Clerk" (DOT 290.433-014) requiring light strength, and (3) "Telephone Solicitor" (DOT 299.357-014) a sedentary job. (AR 117.) The VE did not consider Ms. Bidad's flower watering. (*Id.*)

The ALJ posed several hypotheticals to the VE to determine whether there were jobs existing in significant numbers in the national economy that Ms. Bidad could perform given her impairments. (*Id.*) The ALJ's first hypothetical considered an individual with Ms. Bidad's age, education, and background, along with the following limitations: light exertional levels, the "ability to change positions, from sit to stand at will," and the individual can only perform simple routine tasks. (*Id.*) The VE responded that the individual could not perform Ms. Bidad's past

7

work as cashier, sales clerk, or telephone solicitor. (AR 118.)

Next, the ALJ's second hypothetical adopted the same limitations as above, except that the individual could sit and stand, as a cafeteria worker. (AR 119.) The VE responded that the individual could perform Ms. Bidad's past job as a Cashier II along with the position of Laminating-machine Operator (DOT 569.686-046), requiring light strength. (AR 119-20.) The VE further noted that the national availability of jobs was reduced by half to reflect positions that have the option to sit or stand. (*Id.*)

The ALJ's third hypothetical limited the second hypothetical to only performing postural maneuvers (e.g. stooping, crouching, and crawling occasionally), but the individual could not reach overhead with the right upper extremity, or bilaterally. (AR 120.) The individual was limited to frequent handling and fingering. (*Id.*) The VE responded that the individual could still work as a Cashier II and Laminating-machine Operator. (AR 120-21.)

The ALJ further modified the second hypothetical so that the same individual could only rarely look down or rotate the neck. (AR 121.) The VE responded that the individual could not perform any jobs. (*Id.*) The ALJ further modified the second hypothetical individual to the sedentary level. (AR 121.) The VE responded that the individual could work as Final Assembler (DOT 713.687-018), sedentary; and Toy Stuffer (DOT 731.685-014), sedentary. (AR 122.)

Then, Ms. Bidad's counsel asked the VE whether the individual in any of the hypotheticals could perform these jobs with the limitation of being off-task fifty percent of the time. (AR 122.) The VE responded no. Ms. Bidad's counsel modified the hypothetical such that the individual was off-task twenty percent of the time, and the VE still found such an individual would be unable to perform any jobs. (AR 123.)

**III.    ALJ's Findings**

In a June 2015 written decision, the ALJ found Ms. Bidad not disabled under section 1614(a)(3)(A) of the Social Security Act, taking into consideration the testimony and evidence, and using the SSA's five-step sequential evaluation process for determining disability. (AR 87); *see* 20 C.F.R. § 416.920(g).

At step one, the ALJ determined that the Ms. Bidad had not engaged in substantial gainful

8

activity since the application date of November 29, 2012. (AR 77.) The ALJ noted that the Ms. Bidad worked after this date watering the town flowers and earning $100 a week, but that this did not "rise to the level of substantial gainful activity." (*Id.*)

At step two, the ALJ found that the Ms. Bidad had three severe impairments: (1) status post excision of a cystic hygroma with neck pain; (2) history of headaches; and (3) a mood disorder. (*Id.*) The ALJ determined that the record did not support a finding of medical severity for irritable bowel syndrome, medically determinable mental impairment of hypertension, or sleep apnea. (AR 77.)

At the third step, the ALJ concluded that the Ms. Bidad does not have an impairment or combinations of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 78.) Specifically, the ALJ considered the criteria of listings 12.04 and 12.06, paragraphs (B) and (C). (*Id.*) With regard to paragraph (B), the ALJ concluded that Ms. Bidad's mental impairments do not cause (1) at least two "marked" limitations, meaning more than moderate but less than extreme, or (2) one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, meaning three episodes within one year, or an average of once every four months, each lasting at least two weeks. (*Id.*) With regard to paragraph (C), the ALJ concluded that Ms. Bidad's mental impairments did not satisfy the criteria. (*Id.*) In order to satisfy paragraph (C) there must be evidence that the mental disorder is "serious and persistent," meaning that there is "medically documented history of the existence of the disorder over a period of at least 2 years, and evidence of both:" (1) medical treatment or health therapy, psychological support or a highly structured setting, and (2) marginal adjustment. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04(C), 12.06(C).

The ALJ found that Ms. Bidad had the residual functional capacity ("RFC") to perform light work, was limited to simple, routine work, and requires the option to change positions from sitting to standing at will. (AR 79.) In considering Ms. Bidad's dizziness, diarrhea, and cramps in her arms and legs, the ALJ found that Ms. Bidad's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR 79.) However, Ms. Bidad's

9

testimony regarding the intensity, persistence, and limiting effects of the symptoms was not credible, based on conflicting testimony Ms. Bidad gave regarding her history of illegal drug use as well as the lack of connection between Ms. Bidad's alleged pain and her medical history. (*See* AR 79-80.)

The ALJ concluded that there were conflicting medical opinions regarding Ms. Bidad's mental functioning. (AR 82-85.) The ALJ gave substantial weight to the opinion of examiner Albert Kastl, Ph.D., as Dr. Kastl's findings were consistent with the record. (AR 85.) The ALJ also afforded great weight to the opinion of examiner Soheila Benrazavi, M.D., as her findings were consistent with the record, and supported by her examination. (AR 83.) The ALJ gave little weight to the opinion of treating physician Joel Lewis, D.O., as the record showed no treatment or examinations by Dr. Lewis since the application date. (AR 82.) The ALJ also afforded little weight to the opinion of examining physician Marion Zipperle, Ph.D. because Dr. Zipperle (1) gave a one-time assessment of Ms. Bidad, (2) was referred by Ms. Bidad's representative "without any indication the examiner would remain unbiased," (3) was based "almost entirely on the claimant's (and her significant other's) reported history," and (4) was not "fully consistent with the treatment record or assessment and observations by other treating and examining sources." (AR 84.) Finally, the ALJ assigned partial weight to the opinion of Jennifer Eggert, Ph.D. (AR 85.) The ALJ determined that Dr. Eggert's finding that Ms. Bidad was limited to simple, repetitive tasks was consistent with the record and supported by Ms. Bidad's mild cognitive limitations. (*Id.*) However, the ALJ rejected Dr. Eggert's opinion that Ms. Bidad was limited interacting with others, managing stress, or maintaining an efficient pace, as the ALJ found no support for this opinion. (*Id.*)

At the fourth step, the ALJ found that Ms. Bidad was unable to perform any past relevant work based on the VE's testimony that the RFC exceeds the requirements of fast food cashier and sales clerk. (AR 86.)

At the fifth step, the ALJ concluded that Ms. Bidad could perform jobs that exist in significant numbers in the national economy, including Cashier II and laminating machine operator. (AR 87.)

**DISCUSSION**

Ms. Bidad challenges only one aspect of the ALJ's decision: her treatment of the opinion of examining psychologist Jennifer Eggert, Ph.D. Ms. Bidad insists that the ALJ committed legal error by rejecting Dr. Eggert's opinion. The ALJ, however, did not reject all of Dr. Eggert's opinion; rather she afforded it partial weight, and determined that the record did support all of Dr. Eggert's limitations. Neither substantial nor clear and convincing evidence supports the ALJ's decision.

**I.    The ALJ's Consideration of Medical Opinion Evidence**

**A.    Legal Standard**

In the Ninth Circuit, courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations omitted). Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the

doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014) (internal citation omitted). In weighing medical opinions, the ALJ may consider (1) the examining relationship, (2) the treatment relationship, (3) the supportability, (4) the consistency, (5) the specialization, and (6) other factors brought to the ALJ's attention. 20 C.F.R. § 416.927(c)(5). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Hill v. Astrue*, 388 F.3d 1144, 1159 (9th Cir. 2012) (internal citations omitted). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey*, 849 F.2d at 422.

**B. Analysis**

To reject the opinion of state Agency examining psychologist Dr. Eggert the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for doing so. *See Lester*, 81 F.3d at 830-31. The ALJ gave partial weight to Dr. Eggert's opinion that Ms. Bidad was limited to simple, repetitive tasks because Ms. Bidad's cognitive limitations supported the opinion. (AR 85.) However, she gave no weight to Dr. Eggert's opinion that Ms. Bidad was moderately limited in her interactions with others, and significantly limited her ability to deal with stress and work at an efficient pace, determining that the opinion "was not supported by the record." (*Id.*) The ALJ's decision was not supported by substantial evidence.

First, there is no contradiction in the findings of the three examining psychologists regarding Ms. Bidad's functional limitations. Both Dr. Zipperle and Dr. Eggert reported that Ms. Bidad is moderately or markedly impaired in her interactions with supervisors, coworkers, and the public. (AR 727, 827.) Both Dr. Eggert and Dr. Zipperle noted that Ms. Bidad is significantly or

12

markedly impaired in dealing with work stress and maintaining pace/handling time pressure. (AR 734, 827.) As the ALJ noted, Dr. Kastl did not address whether Ms. Bidad had any functional limitations; thus, the only opinions regarding Ms. Bidad's functional limitations are those of Dr. Zipperle and Dr. Eggert. The ALJ nonetheless rejected their opinions regarding Ms. Bidad's functional limitations and adopted less restrictive interaction, stress management, and pace restrictions despite the absence of contradictory opinion evidence. An ALJ may reject an uncontradicted opinion of an examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. Here, the ALJ failed to provide any reasons, let alone, clear and convincing reasons for rejecting the functional limitations of Drs. Eggert and Zipperle.

Second, among the consultative psychologists, the ALJ gave great weight to the opinion of Dr. Kastl and less or no weight to the other opinions. The ALJ did so because she found Dr. Kastl's opinion "generally consistent with the record." (AR 85.) However, the ALJ ignored that Dr. Kastl examined Ms. Bidad *four years* before Dr. Eggert. Generally, opinions that are more recent in time are favored over those that are more remote. *Johnson v. Astrue*, 303 Fed. Appx. 543, 545 (9th Cir. 2008) (holding that "[t]he ALJ properly rejected medical opinions that were more remote in time, relying more heavily on more recent opinions"). The ALJ did not acknowledge the time deferential between the two opinions or consider the possibility that Ms. Bidad's mental health may have changed or deteriorated in the interim.

Third, the opinion evidence as a whole is also not inconsistent with Dr. Eggert's finding regarding Ms. Bidad's functional limitations. Dr. Kastl diagnosed Ms. Bidad with a mood disorder due to a physical condition and dysthymic affect. (AR 663.) Dr. Lewis—Ms. Bidad's treating physician—noted Ms. Bidad's depression, and that her symptoms would frequently interfere with her attention and concentration. (AR 649.)[1]

Finally, as noted above, Dr. Eggert's finding was consistent with that of Dr. Zipperle, another examining psychologist. Drs. Eggert and Zipperle both reported Ms. Bidad was limited in her interactions, in stress management, and in maintaining pace. (AR 727, 734, 827.) The ALJ

---

[1] Dr. Benrazavi's opinion does not address Plaintiff's mental health. (AR 618-624.)

13

nonetheless wholesale rejected Dr. Zipperle's opinion because it was (1) based on a one-time assessment ordered by her representative, (2) based on Ms. Bidad's own statements, and (3) not "fully" supported by the record of other treating and examining sources. However, that Dr. Zipperle, as the consultative examiner, only examined Ms. Bidad one-time "is hardly surprising and does not by itself provide a legitimate basis to reject [Dr. Zipperle's] medical opinion." *Raven-Jones v. Berryhill*, No. 3:16-CV-03766-LB, 2017 WL 1477128, at *15 (N.D. Cal. Apr. 25, 2017) (collecting cases re: same). Indeed, Dr. Kastl only examined Ms. Bidad one time. Nor is it proper to reject an opinion simply because Ms. Bidad's representative referred the examiner. *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995), as amended (Apr. 9, 1996) ("The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner"). Finally, Dr. Zipperle based her opinion on direct examination and objective testing, not just Ms. Bidad's reported history. *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (holding that an opinion could not be rejected when based in part on the Ms. Bidad's self-report when the opinion was also based on a clinical interview and a mental status evaluation). Thus, the ALJ's reasons for rejecting Dr. Zipperle's opinion regarding Ms. Bidad's functional limitations—which was consistent with the opinion of Dr. Eggert—are not supported by substantial evidence.

In sum, the ALJ's rejection of Dr. Eggert's opinion regarding Ms. Bidad's interactional, stress management, and pace maintenance was not supported by substantial evidence. Because Dr. Eggert's opinion was uncontradicted, the ALJ was required to provided clear and convincing reasons for rejecting it. *Lester*, 81 F.3d at 830. Even under the lesser specific and legitimate standard, the ALJ failed to adequately articulate her reasoning. Beyond citing to the fact that the medical evidence referenced Ms. Bidad as having "pleasant, alert, with appropriate mood and affect," with "no thought disorder" the ALJ does not point to any evidence that contradicts Dr. Eggert's impressions. (AR 82.) Thus, the ALJ's determination that Dr. Eggert's opined limitations in Ms. Bidad's interacting, managing stress, and maintaining pace was not supported by the record is not supported by substantial evidence.

14

The ALJ's error in rejecting Dr. Eggert's opinion without legitimate reasons for doing so cannot be considered harmless error because the error is neither nonprejudicial nor inconsequential to the ultimate disability determination. *See Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir.2012) (an error is harmless if it is "inconsequential to the ultimate nondisability determination"). If the ALJ had accepted Dr. Eggert's interaction, pace, and stress limitations, it seems probable that this would have changed the RFC and thus the ultimate disability determination. Accordingly, the Court cannot conclude that the ALJ's error was harmless, and instead, remands for further proceedings consistent with this Order.

## II. The Scope of Remand

Ms. Bidad asks the Court to remand for immediate benefits under the credit-as-true rule. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). However, a court may remand for an immediate award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12-cv-6179-YGR, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke*, 379 F.3d at 595); *see Leon v. Berryhill*, No. 15-15277, 2017 WL 5150294, at *2 (9th Cir. Nov. 7, 2017) ("where [...] an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency") (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014)).

Here, even if the record was fully developed and the improperly discredited evidence is credited as true, it is not certain that the ALJ would be required to find Ms. Bidad legally disabled under the third part of the credit-as-true standard. *Leon*, 2017 WL 5150294, at *4. That is, even if

15

Dr. Eggert's opinion was credited as true, Ms. Bidad did not question the VE regarding whether an individual with moderate and significant interaction, stress management, and pace maintenance limitations would be able to find a job. While Ms. Bidad's representative asked the VE whether there were any jobs for a hypothetical individual who is off-task twenty percent of the time, it is not clear that this is a direct corollary to the limitations proposed by Dr. Eggert. Because this information is necessary to determine whether Ms. Bidad is in fact disabled, the rare circumstances that result in a direct award of benefits are not present in this case. *See id.* The Court thus remands for further proceedings consistent with this Order.

## CONCLUSION

For the reasons stated above, Ms. Bidad's motion for summary judgment is GRANTED and Defendant's cross-motion for summary judgment is DENIED. (Dkt. Nos. 18, 19.) The ALJ's decision to reject Dr. Eggert's opinion regarding Ms. Bidad's functional limitations was not supported by substantial or clear and convincing evidence. The ALJ's decision is therefore VACATED and the matter is REMANDED for reconsideration consistent with this Order.

**IT IS SO ORDERED.**

Dated: March 20, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge